IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                                       :
CHARLOTINE DUVERGE                    :        3:10 CV 1922 (JGM)
                                                       :
v.                                                    :
                                                       :
UNITED STATES OF AMERICA              :
                                                       :        DATE: OCTOBER 31, 2017
-------------------------------------------------------x
```

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Although familiarity with this Court's previous Ruling on Defendant's Motion for

Summary Judgment, filed April 7, 2014 (Dkt. #68), 2014 WL 1366194 ["April 2014 Ruling"],

is presumed, the lengthy procedural history of this protracted nearly seven-year-old litigation

will be recited below. On December 7, 2010, plaintiff Charlotine Duverge, who was an inmate

at Federal Correctional Institution ["FCI"] in Danbury, Connecticut at the time the allegations

in her complaint occurred, commenced this action pro se under the Federal Tort Claims Act

["FTCA"], 28 U.S.C. § 2671, alleging injuries arising out of treatment by her counselor

following an asthma attack on May 4, 2008, and the medical treatment received thereafter.[1]

(Dkt. #1). Specifically, plaintiff alleges that her counselor caused her to suffer an asthma

attack, injured her arm and shoulder, and gave her an overdose of asthma medication

causing her to have a mild heart attack. (Id.).[2] She also alleges that following this incident,

---

[1]As discussed above, plaintiff's claim is brought under the FTCA. FTCA claims are not
cognizable against individual federal officials; the proper defendant in an FTCA claim, as alleged in
this case, is the United States. See Castro v. U.S., 34 F.3d 106, 110 (2d Cir. 1994)("the FTCA
makes individual government employees immune from common-law tort claims for acts committed
within the scope of their employment").

[2]Specifically, plaintiff alleges that medical reports confirmed "surgical repairment [sic] is
required in [three] places of [her] body[]"; she has become "disabled on the [right] arm, with
numbing on the entire [right] side which could have been prevented had prison officials . . .
provided [p]laintiff with proper medical care, surgeries, and post-operative physical therapy[]";
"Counselor Perkins['] negligence provoked" plaintiff's asthma attack; and when Perkins "pulled and

"[d]ue to the lack of due diligence and delay in access to proper medical treatment, [she] suffered, and continues to suffer[,] . . . severe pain and numbness in her entire [right] side[.]" (Dkt. #1, at 5).

On May 25, 2011, U.S. District Judge Janet Bond Arterton filed an Initial Review Order in which she permitted plaintiff the "opportunity to address the government's response to her [FTCA] claims." (Dkt. #4, at 2-3). On September 9, 2011, defendant filed its answer (Dkt. #7), along with a Motion to Transfer Venue to the District of Minnesota, as plaintiff was incarcerated at FCI Waseca at the time she filed her complaint. (Dkts. ##8-9; see Dkts. ##11, 13-14). Judge Arterton denied defendant's motion, staying and administratively closing the case while plaintiff remained in FCI Waseca. (Dkt. #15).

Consistent with Judge Arterton's order, discovery proceeded (see Dkt. #15; see also Dkts. ##17-20), and sometime prior to July 11, 2012, plaintiff was released; she relocated to Massachusetts and moved to reopen the case. (Dkt. #21; see also Dkt. #24). Privately retained counsel appeared for plaintiff on October 17, 2012. (Dkt. #22). One month later, different privately retained counsel appeared for plaintiff (Dkt. #23); he similarly moved to reopen the case. (Dkt. #25). On December 7, 2012, Judge Arterton granted both motions to reopen and the case was restored to the active docket. (Dkt. #27). In December 2012, both of the parties expressed their intent to consent to the jurisdiction of this Magistrate Judge. (See Dkts. ##28-29, 31). A few months later, in April-May 2013, both of plaintiff's attorneys withdrew from the case (Dkts. ##32-33, 38-39, 41-42), and on April 29, 2013, plaintiff filed her pro se appearance. (Dkt. #36). On May 15, 2013, this case was transferred

---

yanked on [p]laintiff's arm during" such attack, it caused the attack to worsen and caused plaintiff's injuries on her right side; additionally, Counselor Perkins "administered another inmate[']s asthma medication to plaintiff which caused [p]laintiff to suffer a mild heart attack." (Dkt. #1, at 1-2).

to this Magistrate Judge.  (Dkt. #40).

On June 10, 2013, plaintiff filed a Motion to Appoint Counsel (Dkt. #44; <u>see also</u> Dkts. ##42-43 (advising plaintiff that she should notify the Court if she requested <u>pro bono</u> counsel)), which was granted seven days later. (Dkt. #45).  On August 28, 2013, plaintiff filed a Motion for Settlement Conference (Dkt. #48) which was granted two days later (Dkt. #49), and on September 10, 2013, two <u>pro bono</u> attorneys appeared on behalf of plaintiff for "SETTLEMENT PURPOSES ONLY." (Dkt. #51 (emphasis in original); Dkts. ##52-53).  A unsuccessful settlement conference was held before U.S. Magistrate Judge Thomas P. Smith on December 11, 2013 (Dkts. ##55-57; <u>see also</u> Dkt. #54), following which the <u>pro bono</u> counsel withdrew from the case.  (Dkts. ##58-60).

On February 6, 2014, defendant filed its first  Motion for Summary Judgment (Dkt. #66), and on February 28, 2014, plaintiff, once again proceeding <u>pro se</u>, filed her brief in opposition.  (Dkt. #67; <u>see also</u> Dkt. #64). On April 7, 2014, this Magistrate Judge denied defendant's Motion in the April 2014 Ruling, and the Clerk was directed to appoint <u>pro bono</u> counsel.  (Dkt. #68; 2014 WL 1366194).  Three months later, on July 18, 2014, new <u>pro bono</u> counsel, plaintiff's fifth attorney in this case, appeared. (Dkt. #70).

Following a telephonic status conference held on October 6, 2014, this Magistrate Judge directed plaintiff's <u>pro bono</u> counsel to review plaintiff's underlying medical reports from the Bureau of Prisons ["BOP"], and report back to Chambers.  (Dkt. #73).  Eleven days later, the Government filed a Notice by USA of Sending Medical Records to Successor Counsel.  (Dkt. #75).  Five months later, on March 3, 2015,  having not heard from <u>pro bono</u> counsel, this Magistrate Judge ordered counsel to file status reports (Dkt. #76); the Government filed its report two days later (Dkt. #77).  Twenty-two days after this Magistrate

Judge issued her order to counsel, a second order was filed directing plaintiff's <u>pro bono</u> counsel to

> file his Status Report, communicate with his client and discuss fully the merits of the lawsuit, and then contact both defense counsel and the Court to schedule a continued status conference; plaintiff's [<u>pro bono</u>] counsel must file a Motion for Relief from Appointment consistent with all the provisions of Local Rule 83.10(d); or plaintiff herself must file a Motion for Discharge pursuant to Local Rule 83.10(e).

(Dkt. #78).  Plaintiff's counsel filed his status report over a month later, on April 29, 2015 (Dkt. #79), in which he reported that plaintiff was in the process of locating medical records from the prison she was transferred to, FCI Waseca, after her initial incarceration in FCI Danbury, as well as treatment records since the date of her release.  The next day, defendant filed its response disputing plaintiff's representation that she was seeking additional medical records from the Bureau of Prisons.  (Dkt. #80).  On May 13, 2015, this Magistrate Judge held a status conference during which deadlines were set (Dkt. #82); discovery was scheduled to close on or before December 31, 2015 and dispositive motions were to be filed on or before February 12, 2016.  (Dkt. #83).  On the same day, the case was administratively closed

> [i]n light of the extended period of time it has taken (and may continue to take) for counsel to obtain copies of <u>ALL</u> of plaintiff's medical records, including those after she was released from custody[;] in light of circumstances regarding one potential witness[;] and in light of the age of this file[.]

(Dkt. #84).

In November and December 2015, the Government filed two Motions to Compel (Dkts. ##85, 87), which were granted in part such that plaintiff was ordered to produce her medical records to defendant; discovery was extended to April 29, 2016; and the dispositive motion deadline was extended to May 31, 2016.  (Dkt. #89).

On March 14 and April 4, 2016, the Government filed successive Motions to Dismiss (Dkts. ##91, 94), for plaintiff's failure to comply with the Court's discovery orders.  On April 4, 2016, plaintiff's pro bono counsel filed a status report in which he requested additional time for discovery (Dkt. #95), and ten days later, plaintiff, proceeding pro se filed her objection to defendant's motion and requested a trial date.  (Dkt. #96).  Fifteen days thereafter, on April 29, 2016, this Magistrate Judge issued her Ruling denying defendant's motions to dismiss without prejudice to renew as appropriate (Dkt. #97), and extended the discovery deadline "**for the very last and final time**" to July 29, 2016.  (Id. at 3 (emphasis in original)); see also 2016 WL 1732709.

On June 1, 2016, defendant filed another Motion to Dismiss (Dkt. #98), again for plaintiff's failure to abide by the Court's discovery orders, and after plaintiff's pro bono counsel withdrew his appearance seven days later (Dkt. #99), this Magistrate Judge filed a ruling denying defendant's motion without prejudice to renew as appropriate.  (Dkt. #102); see also 2016 WL 4099023. On August 29, 2016, new pro bono counsel filed his appearance; this sixth attorney for plaintiff was appointed for discovery only. (Dkts. ##103-04).

Following a telephonic status conference held on November 17, 2016 (Dkt. #108; see also Dkt. #107 (status/settlement conference held on October 6, 2016)), this Magistrate Judge set a deadline of May 31, 2017 for all discovery, and a deadline of June 30, 2017 for dispositive motions.  (Dkt. #109).  On January 30, 2017, defendant filed a Motion to Compel complete discovery responses (Dkt. #110); plaintiff failed to file a timely opposition, and on February 28, 2017, a Ruling was filed in which defendant's motion was granted with compliance ordered by March 22, 2017.  (Dkt. #111).  At the close of discovery, and thirty days following plaintiff's deposition, plaintiff's pro bono counsel moved to withdraw his

appearance consistent with the condition of his appointment; his motion was granted the same day, June 30, 2017.  (Dkts. ##118-19; <u>see also</u> Dkts. ##112-17).[3]

Following a Motion for Extension of the dispositive motion deadline (Dkts. ##120-21), defendant filed the pending Motion for Summary Judgment[4] with brief and exhibits in support on August 9, 2017.  (Dkts. ##122-26).[5]  On August 25, 2017, plaintiff filed her brief in opposition (Dkt. #127), along with a Motion to Request a Trial Date.  (Dkt. #128).[6]  Five days later, defendant filed its reply brief (Dkt. #129),[7] and on September 20, 2017, plaintiff filed her surreply brief.  (Dkt. #130).

For the reasons set forth below, defendant's Motion for Summary Judgment (Dkt. #122) is <u>granted in part and denied in part</u>.

I. FACTUAL BACKGROUND

As an initial matter, plaintiff has not complied with Local Rule 56(a) of the Local Rules of Civil Procedure for the District of Connecticut. Local Rule 56(a) provides that a party

---

[3]This last <u>pro bono</u> attorney was specifically thanked "for his invaluable service to the Court and to plaintiff, . . . [and for] the highest degree of professionalism and courtesy [he displayed] to everyone involved in this litigation."  (Dkt. #119).

[4]Attached to defendant's motion is a Declaration of Cheryl Magnusson, sworn to August 2, 2017 ["Magnusson Decl."](Dkt. #122-1); copy of Local Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut (Dkt. #122-2); copy of Rule 56 of the Federal Rules of Civil Procedure (Dkt. #122-3); and copy of Notice to <u>Pro Se</u> Plaintiff (Dkt. #122-4).

[5]Along with defendant's brief in support was a Motion to Seal (Dkt. #123), which was granted the same day.  (Dkt. #126). Accordingly, defendant's brief in support (Dkt. #125), Local Rule 56(a) Statement (Dkt. #124-1)["Def. Local R. 56(a)1 Stmt"], the copy of the transcript of plaintiff's deposition ["Pl. Depo."](Dkt. #124-2); and medical records from 2007-2012 from BOP Dkts. ##124-3 to 124-8), as well as post incarceration medical records (Dkt. #124-9) were all filed under seal.

[6]On October 2, 2017, plaintiff's Motion to Request a Trial Date was denied without prejudice to renew, if appropriate, following this Court's ruling on the pending Motion for Summary Judgment.  (Dkt. #131).

[7]Attached to defendant's reply brief is a copy of case law.

opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c).

D. CONN. L. CIV. R. 56(a)(2)(i).[8]   Additionally, the party opposing summary judgment must also, in a separate section entitled "Additional Material Facts[,]" set forth "any additional facts . . . that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party."   D. CONN. L. CIV. R. 56(a)(2)(ii).  Each statement of material fact, and each denial, must be followed by a specific citation.  D. CONN. L. CIV. R. 56(a)(3).  "Failure to provide specific citations to evidence in the record as required by [the] Local Rule may result in the Court deeming admitted certain facts that are supported by evidence in accordance with Local Rule 56(a)1[.]" Id.  Alternatively, the Court may "impos[e] sanctions, including, . . . when the opponent[, in this case, the self-represented plaintiff,] fails to comply, an order granting the motion if the motion and supporting materials show that the movant[, in this case, the defendant,] is entitled to judgment as a matter of law."  Id.

Plaintiff was apprised of the requirement of submitting admissible evidence demonstrating a genuine issue for trial because the "Notice to Pro Se Litigant"[9] and copies of the applicable federal and local civil rules were attached to defendant's motion. (See Dkts.

---

[8]This is not the first time the parties have not complied with Local Rule 56 in this case. This Court admonished both plaintiff and defendant for failing to comply with Local Rule 56 in their briefing on the 2014 motion for summary judgment. See 2014 WL 1366194, at *1-2.

[9]As of the May 4, 2017 Amendments to the Local Rules of Civil Procedure for the District of Connecticut, the notice is captioned, "Notice to Self-Represented Litigants Regarding Summary Judgment As Required by Local Rule of Civil Procedure 56(b)[.]"

##122-2 to 122-4).[10]  However, plaintiff did not file a Local Rule 56(a)2 Statement nor did she offer any exhibits in support of her one-page brief in opposition.  (Dkt. #127).

Although plaintiff's failure to comply with the Local Rules could, by itself, result in granting summary judgment in defendant's favor, the Court declines to impose such a sanction on plaintiff.  See Vitale v. Catanese, No. 3:11 CV 1831 (MPS), 2013 WL 3992394, at *1, n.2 (D. Conn. Aug. 2, 2013)(citation omitted)("Plaintiff's failure to file a 56(a)(2) Statement is alone grounds for granting the Motion for Summary Judgment. Nonetheless, the Court will reach the merits of [p]laintiff's claim.")(citation omitted).   Rather, "[i]n deference to . . . [p]laintiff's pro se status," this Court, "to the extent possible, will regard . . . [p]laintiff's version of the facts contained in [her] opposition (excluding arguments or conclusory statements) as responsive" to defendant's Local Rule 56(a)1 Statement.  Wilks v. Elizabeth Arden, Inc., 507 F. Supp. 2d 179, 185 (D. Conn. 2007).  The facts contained in plaintiff's opposition in this case relate to her claim of injury; thus, the Court will consider the medical records submitted in support of defendant's motion.  As the court explained in Wilks:

> This policy of liberally construing pro se submissions is driven by the understanding that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.

Id., quoting Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006)(internal quotations omitted).  However, this Court will deem admitted all facts set forth in defendant's Local Rule 56(a)(1) Statement that are supported by evidence, and that are not refuted in plaintiff's brief in opposition.[11]

---

[10]See also note 9 supra.

[11]Defendant includes several statements that require legal conclusions; accordingly, such statements are not included in the Court's findings of fact.

Accordingly and in light of the foregoing discussion, the Court finds the following undisputed facts.

Plaintiff was incarcerated at FCI Danbury from June 6, 2007 through October 7, 2009. (Def. Local R. 56(a)1 Stmt ¶ 4; Magnusson Decl. ¶ 3). Plaintiff was transferred to FCI Waseca in Waseca, Minnesota, between October 7-13, 2009, and remained incarcerated at that facility from October 13, 2009 until her release on July 6, 2012. (Def. Local R. 56(a)1 Stmt ¶¶ 4-5; Magnusson Decl. ¶ 3; Pl. Depo. at 17).

On May 4, 2008, the date of the incident at issue in this lawsuit (see Def. Local R. 56(a)1 Stmt ¶ 4; Pl. Depo. at 64-67), Counselor Perkins at FCI Danbury saw plaintiff after she had fallen on the floor (Pl. Depo. at 67-68) and, in plaintiff's words, Perkins "was pulling me up [by] my shoulder but she wasn't pulling me in a way to hurt me." (Id.; see Def. Local R. 56(a)1 Stmt ¶ 14). Plaintiff received treatment for her shoulder at both FCI Danbury and FCI Waseca. (See Def. Local R. 56(a)1 Stmt ¶ 15; Pl. Depo. at 71).

One or two days following the incident, plaintiff was taken to Danbury Hospital. (Compare Pl. Depo. at 72 (testifying that she was seen the next day, on May 5, 2008) with Dkt. #124-5, at 93-95 (Danbury Hospital records dated May 6, 2008)). Plaintiff received copies of all of her medical records from the BOP, as well as from Boston Medical after plaintiff was released from BOP custody. (Id. at 52-53, 72-75; see Def. Local R. 56(a)1 Stmt ¶¶ 12-13). There are no references in any of these records to plaintiff having had a heart attack (See Def. Local R. 56(a)1 Stmt ¶ 12; Pl. Depo. at 51-53), and no one has told plaintiff that she has a heart problem. (See Def. Local R. 56(a)1 Stmt ¶ 10; Pl. Depo. at 44).[12]

---

[12]However, plaintiff testified that she "just remembered[]" that she suffered a heart attack on May 4, 2008. (Pl. Depo. at 51).

Additionally, plaintiff does not recall telling her treating doctor, Dr. Berman, that she had previously suffered a heart attack. (See Def. Local R. 56(a)1 Stmt ¶ 11; Pl. Depo. at 51). Plaintiff applied for and was denied disability benefits. (See Def. Local R. 56(a)1 Stmt ¶ 22; Pl. Depo. at 134).

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well established. The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). This showing may be made by depositions, affidavits, interrogatory answers, admissions, or other exhibits in the record. FED. R. CIV. P. 56(c). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.'" Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lily & Co., 654 F.3d 347, 358 (2d Cir. 2011)(citation omitted).

"Where one party is proceeding pro se, the Court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested in those papers." Collins v. Experian Credit Reporting Serv., 494 F. Supp. 2d 127, 131 (D. Conn. 2007), citing Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007); see also Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir. 1994)(pro se litigants are afforded "special solitude"); Brownell v. Krom, 446

F.3d 305, 310 (2d Cir. 2006)(citation omitted)(pro se litigant's submissions must be construed "liberally"); Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)(citation omitted)(submissions must be read to raise the strongest arguments that they "suggest")(citation omitted). That said, however, "a 'bald assertion, completely unsupported by evidence,' cannot overcome a properly supported motion for summary judgment[,]" Collins, 494 F. Supp. 2d at 131-32, quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991), and pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)(citation & internal quotations omitted).

Defendant moves for summary judgment on grounds that plaintiff lacks evidence to support her claims as she has not disclosed a medical expert, nor is there evidence of the medical conditions she alleges in her complaint. (Dkt. #124, at 4-5, 7-11). In her one-page brief in opposition, plaintiff asserts that she is permanently disabled "due to the injuries inflicted and the delay[ ] of proper medical care and treatments[,]" and that she is "medically unable to work to provide for herself [and her] family. (Dkt. #127).

B. FEDERAL TORT CLAIMS ACT

1. NEGLIGENCE CLAIM

Plaintiff has brought her action against the Government under the FTCA. The FTCA is a limited waiver of the United States' sovereign immunity. See 28 U.S.C. § 2679(b)(1). The FTCA permits individuals to file, inter alia, personal injury claims against the United States based on the acts of a government employee who is acting within the scope of his or her employment, if "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

occurred."  28 U.S.C. § 1346(b)(1).  "'[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees.'"  Freeman v. United States, 166 F. Supp. 3d 215, 219 (D. Conn. 2016), quoting Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012)(additional citation omitted).

In this case, plaintiff alleges that she suffered injuries arising out of treatment by her counselor following an asthma attack on May 4, 2008, and that she received inadequate medical treatment thereafter.  (Dkt. #1).[13]  As this Court discussed in its April 2014 Ruling:

> A medical malpractice claim "involves a medical professional's judgment, but when medical personnel commit tortious acts that do not require medical knowledge, do not exercise medical judgment and are not related to medical diagnosis or treatment, such acts constitute ordinary negligence, not medical malpractice."  Beshara[ v. Charlotte Hungerford Hosp. Ctr. for Behavioral Health, No. CV136008907S], 2014 WL 660486, at *3 ([Conn. Super. Ct. Jan. 21, 2014)]. . . . Plaintiff's relationship with Counselor Perkins did not arise out of a medical-professional relationship, and the alleged negligence does not relate to a medical judgment as Perkins is not a medical professional capable of such judgment and her actions were responsive, not to plaintiff's alleged asthma attack, but to a scenario which Perkins allegedly viewed as a "mad attack" rather than an asthma attack. (Dkt. #1, at 2).

2014 WL 1366194, at *6.  Accordingly, as to plaintiff's claim arising out of Counselor Perkins' actions, plaintiff is asserting a negligence claim. The elements of a negligence cause of action under Connecticut law are duty, breach of that duty, causation and actual injury. Jagger v. Mohawk Mountain Ski Area, Inc., 269 Conn. 672, 687, n.13 (2004)(citations & internal quotations omitted)("essential elements of a cause of action in negligence are well

---

[13]Specifically, in addition to alleging medical malpractice against defendant in the "lack of, and delay in, access to treatment" of plaintiff's medical conditions that "required surgery[,]" plaintiff alleges that Counselor Perkins' negligence "provoked [p]laintiff to suffer an asthma attack[;]" Counselor Perkins "pulled and yanked on [p]laintiff's arm during her asthma attack which caused [p]laintiff's condition to worsen, and caused the injuries to [p]laintiff's [right] arm and [right side[]]"; and Counselor Perkins administered the "wrong medication [causing plaintiff to receive an] overdose."  (Dkt. #1, at 1-5).

established: duty; breach of that duty; causation; and actual injury[]").[14]

As discussed above, plaintiff alleges that she suffered orthopedic injuries as a result of Counselor Perkins' action, and that she suffered a heart attack as a result of her asthma attack on May 4, 2008.  In her brief in opposition to defendant's motion, plaintiff asserts that she is "permanently disable[d] due to the injuries inflicted and the delay[] of proper medical care and treatments[]" (Dkt. #127), and in her surreply brief, she claims that she was denied care for "serious life threaten[ing] medical conditions[.]" (Dkt. #130, at 1).

Defendant, as the moving party on this Motion for Summary Judgment, "may succeed by showing that little or no evidence exists to support the plaintiff's claims" of injury. Johnson-Barnwell v. FCI Danbury, No. 3:10 CV 1301 (DJS), 2014 WL 839247, at *4 (D. Conn. Mar. 4, 2014), citing Ockimey v. Town of Hempstead, 425 F. App'x 45 (2d Cir. 2011). Conversely, plaintiff, as the nonmoving party, "must submit admissible evidence demonstrating a genuine issue for trial." Id., citing Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law[.]" McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009)(internal quotations & citation omitted).

In its brief in support, defendant relies heavily on Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005), in which case the Second Circuit found a narrow exception to the general rule that "[a]ssessments of credibility and choices between conflicting versions

---

[14]In the Initial Review Order issued by Judge Arterton on May 25, 2011, she described plaintiff's claims as "claims of negligence against Danbury federal prison employees [for which plaintiff] seeks relief pursuant to the Federal Tort Claims Act . . . ." (Dkt. #4, at 2-3).

of events are matters for the jury, not for [the court] on summary judgment." (citations omitted). In Jeffreys, summary judgment was granted where the plaintiff's case relied on self-serving testimony, and the plaintiff's description of events, as he testified at his deposition, differed remarkably from the accounts that he gave shortly after the incident at issue occurred. Id. at 554-55. The Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may decide that no reasonable jury could credit plaintiff's version of events. Jeffreys, 426 F.3d at 554 (emphasis added)(citation omitted). The Second Circuit concluded:

> In the circumstances presented in the instant case–where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, . . . the District Court did not err by awarding summary judgment.

Id. at 555 (alteration & quotation marks omitted).

This case, however, is not a "rare" case like Jeffreys, id. at 554, with "real, unequivocal, and inescapable contradiction[.]" Rivera v. Rochester Genesee Regional Transp. Auth., 743 F.3d 11, 23 (2d Cir. 2014). In this case, plaintiff's description of the underlying events did not change through the progression of this case, and her shoulder injury is corroborated by contemporaneous medical records. Thus, this case does not fall within the narrow exception articulated in Jeffreys.

Moreover, defendant's reliance on Ferraresso v. Town of Granby, 646 F. Supp. 2d 296 (D. Conn. 2009), is similarly misplaced. In Ferraresso, Senior U.S. District Judge Dominic J. Squatrito granted summary judgment on plaintiff's claim of unreasonable force under the Fourth Amendment on grounds that the plaintiff in that case "ha[d] not shown that he

suffered a compensable injury to his wrists" from the handcuffs applied during his arrest; he "did not mention [that he was] feeling pain" or indicate that he was "suffering . . . an injury[,]" nor did he seek "medical attention for his wrists at any time after the incident." Id. at 307-08 (citation omitted).  Additionally, Judge Squatrito concluded that there was "no proof that [defendant] . . . used force that would constitute a constitutional violation."  Id. at 308 (citation omitted).[15]

In this case, however, plaintiff alleged in her Complaint, filed almost seven years ago, that Counselor "Perkins pulled and yanked on [p]laintiff's arm during her asthma attack which caused [p]laintiff's condition to worsen, and caused the injuries to [p]laintiff's [right] arm and [right] side."  (Dkt. #1, at 2).  Similarly, at her deposition taken on June 1, 2017, plaintiff testified that Perkins was "pulling [her] on [her] shoulder, [and plaintiff] would say that was the reason [her] shoulder got torn."  (Pl. Depo. at 70).[16]  Plaintiff testified at her deposition that when two other FCI Danbury employees questioned Perkins for "pulling on [plaintiff] on the floor . . . and . . . dragging [plaintiff] on the floor[,]" Perkins replied that plaintiff was having "a mad attack[]" because she was being relocated from her cell.  (Id. at 68; see also id. at 64-68).  Plaintiff further swore that she had "[n]o problem[]" with her

---

[15]Similarly, defendant relies on Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 469-70 (S.D.N.Y. 1998), aff'd in relevant part, 205 F.3 1324 (2d Cir. 2000), in which case the facts alleged by the plaintiff were "so contradictory that doubt [was] cast upon their plausibility[.]" The plaintiff in that case changed his characterization of his injuries and relied on his medical records "but only insofar as they 'attributed [his] injuries to the defendants[,]" while "[s]imultaneously . . . question[ing] the accuracy of the medical reports," contending that "clearly, a lot of [his] injuries were not recorded by the medical staff."  Id. at 469. (citations omitted).  The court held that a party cannot survive summary judgment by putting forth "allegations of the events at issue [that] are replete with inconsistent and contradictory statements."  Id. at 470.

[16]See note 15 supra. In Pico, the court noted from "the complaint, to plaintiff's deposition, to his opposition papers to defendants' summary judgment motion, plaintiff's allegations of the events at issue are replete with inconsistent and contradictory statements." 994 F. Supp. at 470.

right shoulder prior to this incident.  (Id. at 71). According to plaintiff, as a result of this injury, she cannot "even get [herself] dressed sometimes[]"; she needs "assistance even showering [herself] sometimes[]"; she cannot "prepare [her] own [meal] because [she has] weakness in [her] right hand, [her] right side[]"; and, she cannot "even get up by [herself] without someone giving [her] a hand out of bed."  (Pl. Depo. at 78-79).   Defendant contends, however, that there is no evidence that plaintiff, in fact, suffered any injury.

Unlike the plaintiff in Ferraresso, plaintiff received medical care following her injury at the emergency room of Danbury Hospital, at FCI Danbury, and then later at FCI Waseca. (Pl. Depo. at 71-72).  Noticeably absent from plaintiff's medical records, however, is any reference to plaintiff having a heart attack as a result of her asthma attack on May 4, 2008. At her deposition, plaintiff acknowledged that there are no references in any of these records to plaintiff having had a heart attack  (Pl. Depo. at 51-53), and no one has told plaintiff that she has a heart problem.   (Id. at 44).[17] Additionally, plaintiff does not recall telling her treating doctor, Dr. Rebecca Berman, that she had previously suffered a heart attack (id. at 51), nor do Dr. Berman's records reference that plaintiff has had a heart attack.  (Id. at 51-52; see generally Dkt. #124-9, at 12-99).   Thus, in the utter absence of any evidence to support her claim, defendant's Motion for Summary Judgment as to plaintiff's claim that she suffered a heart attack as a result of the negligence of Counselor Perkins is granted.

Turning to plaintiff's other claimed injuries, the records reveal that following the incident, plaintiff was diagnosed with "[r]otator cuff syndrome" (Dkt. #124-5, at 93-95), and then with right shoulder bursitis (Dkt. #124-5, at 27, 96) and "[r]ight peroneal tendinitis[,]"

---

[17]As noted earlier, plaintiff testified at her deposition that she "just remembered[]" that she suffered a heart attacked on May 4, 2008. (Pl. Depo. at 51).

(id. at 27), and the record is replete with medical appointments, orthopedic consults, x-rays and MRIs in response to the orthopedic injury plaintiff sustained on May 4, 2008. The records also reflect that over the next several years, she complained of pain, had minor restrictions, and often did not give her full effort, malingered, or was "unable/unwilling to move arm[]" when examined. (Dkt. #124-5, at 88, 99; Dkt. #124-4, at 10). As stated in Section I. supra, the facts contained in plaintiff's opposition in this case relate to her claim of injury; thus, given plaintiff's pro se status, and affording her consideration of a liberal interpretation of her claims, the Court will consider the medical records submitted in support of defendant's motion. See Wilks, 507 F. Supp. 2d at 185.

### a. MEDICAL RECORDS: FCI DANBURY AND FCI WASECA

Two days after the incident, on May 6, 2008, plaintiff was seen at the Emergency Department of Danbury Hospital (Dkt. #124-5, at 93-95); x-rays of her shoulder were negative (id. at 97), and she was discharged with a diagnosis of "[r]otator cuff syndrome[.]" (Id. at 93). Plaintiff returned for a follow up visit with Dr. Tiffany Sanders at FCI Danbury on May 29, 2008, at which time she had limited active and passive range of motion in her right shoulder, and complaints of pain with abduction past forty-five degrees. (Dkt. #124-4, at 9-10). After reviewing plaintiff's x-rays, she "discussed with [plaintiff that] surgery would not be indicated as there was no fracture or dislocation." (Id. at 9). Dr. Sanders noted that plaintiff has "some minor malingering," and she opined that it was "likely ok to [discharge] sling [sic] post orthopedic visit[.]" (Id. at 10).

On June 6, 2008, plaintiff reported continued pain in her right shoulder and right elbow. (Dkt. #124-5, at 88). X-rays were negative, and there was no swelling. (Id.). The medical record noted that plaintiff was "unable/unwilling to move arm." (Id. at 88, 101).

On June 9, 2008, Dr. Sanders ordered an MRI of plaintiff's right shoulder (Dkt. #124-4, at 10), and plaintiff was placed on a restriction of no ladders or upper bunk, and she was confined to her cell with limited exceptions. (Id. at 29-30; see id. at 31). The MRI results revealed a "small amount of bursal surface signal toward the musculotendinous junction of the supraspinatus, consistent with fraying, minor partial thickness tearing." (Dkt. #124-5, at 96). Additionally, the "acromion process [was] somewhat hooked in morphology but there [was] no subacromial enthesophyte or subacrominal subdeltoid bursitis[]"; the "biceps long head tendon [was] intact[]"; and there was "[n]o labral tear . . . detected." (Id.). Upon request from Dr. Sanders, plaintiff was seen for a consult on August 1, 2008; the doctor noted that the MRI did not show an acute injury, and that plaintiff was "getting better[.]" (Id. at 100). Plaintiff had "good passive [range of motion]" and no swelling, and was diagnosed with right shoulder "impingement/bursitis[.]" (Id.).

On September 12, 2008, BOP records reflect that plaintiff had complaints of right foot pain and right knee pain since May 2008; plaintiff rated her right foot pain as an eight on a scale to ten. (Dkt. #124-4, at 5-6). Upon examination, tenderness was noted in both her foot and knee, and there was "[m]inimal marginal [o]steophyte formation and minimal patellar spurring[]" in her knee, as well as "[m]ild bony prominence at the base of the 5th metatarsal on [her right] foot." (Id.; see Dkt. #124-5, at 109, 111 (July 1, 2008 x-rays); see also Dkt. #124-4, at 4 (BOP medical records, dated September 12, 2008, reflect that plaintiff "must be refer[red] to Ortho" for her right knee pain and right foot pain)). On September 25, 2008, plaintiff was seen for complaints of lower extremity pain in her right knee, right shoulder, and right foot. (Dkt. #124-4, at 1-2). She was placed on "idle" status until October 7, 2008 and was referred to "Ortho to check X[- ray.]" (Id. at 2). On October 3,

2008, she was seen for the orthopedic consult; her range of motion was "better, although [she was] still giving poor effort." (Dkt. #124-5, at 99; <u>see also id.</u> at 31). On October 21, 2008, it was noted that plaintiff was "doing well[]" and should follow up with medical personnel. (<u>Id.</u> at 31).

According to Counselor Perkins, on December 15, 2008, plaintiff performed in a play held in the Visiting Room at FCI Danbury; plaintiff's role involved "a lot of arm motion which her arms constantly remain[ed] elevated when she would combine hands with another inmate and spin each other around." (<u>Id.</u> at 106). On December 19, 2008, plaintiff was seen for another orthopedic consult (<u>id.</u> at 98); the orthopedist found decreased range of motion in her right shoulder, but also questioned "poor effort"; plaintiff had mild swelling in her lateral foot; plaintiff was diagnosed with mild bursitis and right peroneal tendinitis. (<u>Id.</u>). Five days later, Dr. Sanders reviewed these orthopedic records and noted that plaintiff had "[m]ild right shoulder bursitis[,]" and "[r]ight peroneal tendinitis[,]" for which over the counter NSAIDs and a right ankle brace were ordered. (<u>Id.</u> at 27).

In March 2009, plaintiff complained of right foot, right knee, and right shoulder pain which had persisted since May 2008. (<u>Id.</u> at 23-24). She could not lift her right shoulder over her head; she had no tenderness with palpation, but she reported that the pain was ten on a scale of ten; and she had tenderness with palpation on her right foot and right knee, but no swelling in either location. (<u>Id.</u>). Plaintiff was restricted to not lifting more than fifteen pounds, and not using a ladder or an upper bunk, and she "must be seen by Ortho to determine future [diagnosis]." (<u>Id.</u> at 53). Plaintiff was referred to an orthopedist due to her history of "minor partial thickening tear[]" in her right shoulder; "minimal patelar spurring" in her right knee; and, "[m]ild bony prominence at the base of the [fifth]

metatarsal[]" in her right foot.  (Id. at 24).   In June 2009, plaintiff complained of pain in her right shoulder and, upon examination, exhibited tenderness in the shoulder  (id. at 8); in August 2009, she continued to complain of right knee pain from her fall on May 4, 2008.  (Id. at 1-2).  At that time, although she rated her pain as a four on a scale to ten, she reported that her pain in both of her legs "[was] better because she has been taking [N]aproxen." (Id.).

Plaintiff was transferred to FCI Waseca in early October 2009. (Magnusson Decl. ¶ 3).  At her health screening at FCI Waseca on October 14, 2009, plaintiff reported pain in her right shoulder and right knee from her May 2008 fall.  (Dkt. #124-6, at 85).  On October 23, 2009, plaintiff reported that, on the past two mornings, she woke with numbness and tingling in her right extremity; upon examination, no abnormalities were noted.  (Id. at 71).  This marks the beginning of plaintiff's complaints of right side numbness; these complaints last to the present day.

Plaintiff returned for medical treatment on December 2, 2009 with complaints of "[s]evere" right shoulder, knee, and foot pain and numbness.  (Id. at 65; see id. at 55, 62-64).  According to plaintiff, she was experiencing paralysis on her right side, and she could not put her right shoe on; she was given a "casual shoe" for her right foot, and was placed on "[c]allout."  (Id. at 65-66; see also id. at 59-61 (seen with sandal on right foot; complaint that the shoe does not fit and hurts)).  Plaintiff was diagnosed with mild right shoulder bursitis.  (Id. at 63).

On February 1, 2010, plaintiff was seen, inter alia, for complaints of "severe" pain in her right shoulder, knee and foot.  (Id. at 42).  She was given Sulindac and informed that after the month's prescription runs out, she must use over-the-counter medications for pain

management.  (Id.).  Eighteen days later, plaintiff was shown physical therapy exercises for her hand and right shoulder pain.  (Id. at 40; see id. at 39; see also id. at 159-60 ("poor effort" on examination); id. at 161 ("[r]ight upper and lower extremity paraesthesias. . . . Patient exhibiting pain behaviors.")).  Plaintiff returned on March 11, 2010 with the same complaints; she underwent an x-ray of her right foot.  (Id. at 35-38).

Plaintiff was seen for a neuropathy consult on March 15, 2010.  (Id. at 32-34).  At this appointment, her story changed slightly, both in timing, and the sequence of events surrounding the fall.  Plaintiff reported that she fell "last October as a result of an asthma attack[]"; she was not able to lift her right arm, and she was having episodes when her arm would become numb.  (Id. at 32).  The examining doctor noted that plaintiff's "description of the fall in October [did] not seem logical[]" as she denied having had a seizure, yet stated that "an inmate who observed the October fall stated that there was some jerking of the extremities suggestive of a seizure."  (Id.).  Upon examination, plaintiff had full motor strength, and plaintiff's pain in her right ankle and foot were noted.  (Id. at 32-33).[18]  Three months later, on June 15, 2010, plaintiff reported numbness in her arm that lasted, at times, as long as thirty minutes.  (Id. at 17).  Plaintiff had "equal full range of motion bilaterally on arm/hands." (Id.).  Plaintiff returned for a follow-up with neurology on July 16, 2010; she could not raise her right arm above eighty degrees or rotate it back more than twenty degrees.  (Id. at 13-14).  The examining doctor noted that the "[n]erve involvement [was] not clear."  (Id. at 14).  On August 2, 2010, plaintiff reported "[s]evere pain in [her] right shoulder and constant numbness[,]" adding, "[n]ow the numbness i[s] in my legs."  (Id. at

_____

[18]On April 26, 2010, plaintiff underwent a diabetes foot screening during which she reported right foot pain "due to history of injury 5/4/08[.]" (DKt. #124-6, at 152).

21

9).  Upon examination she had tenderness, decreased range of active and passive motion, weak hand grasp in her right hand, and limited abduction and flexion.  (Id.).  The medical record noted a "[h]istory of torn rotator cuff and fractured shoulder on right."  (Id. at 10).

Plaintiff was seen on August 2, 2010 for complaints of "[s]evere pain in [her] right shoulder and constant numbness[]" that radiated to her fingers, as well as numbness in both of her legs.  (Dkt. #124-6, at 9).  On October 22, 2010, plaintiff was seen by Neurology for an evaluation of her right arm and leg numbness and tingling; a brain MRI was recommended.  (Dkt. #124-7, at 54-55, 114-16; see id. 52-53, 56-58, 127).  In November and December 2010, plaintiff complained of headaches and neck pain.  (Id. at 35-40).  On December 8, 2010, plaintiff underwent a MRI of her brain, the results of which were "[n]ormal[.]" (Id. at 113).

On January 21, 2011, plaintiff complained of vision changes and "severe pain in [her] head and neck," which "began in November, after she fell."  (Id. at 33-34; see id. at 111 (January 24, 2011 request to be seen for right shoulder and right foot pain)).  On March 21, 2011, plaintiff requested that she be seen by a physical therapist again because she had continued pain and numbness in her shoulder.  (Id. at 26-29; see id. at 86-88 (April 22, 2011: restricted to lifting less than fifteen pounds; no ladders/no upper bunk; no outdoor work)).  She underwent physical therapy on June 3, 2011, in which medical note the therapist commented that plaintiff had "inconsistent effort" when she underwent physical therapy a year prior, and that x-rays were recommended but no further physical therapy follow up was recommended.  (Id. at 103; see id. at 7 (record dated June 3, 2011; see id. at 84 (June 13, 2011: plaintiff was restricted to lifting less than fifteen pounds; no ladders/no upper bunk; no outdoor work)).  On June 28, 2011, plaintiff underwent radiology imaging of her right

shoulder, the results of which were negative. (Id. at 102). As of November 17, 2011, plaintiff reported her right shoulder pain as a six on a scale to ten; she was assessed as having a "[s]prain and strain of her supraspinatus (muscle) (tend)[.]" (Dkt. #124-8, at 18-20; see also id. at 45 (plaintiff restricted to lifting less than fifteen pounds; no ladders/no upper bunk; no outdoor work; no prolonged standing)).

On February 24, 2012, plaintiff reported that she was experiencing muscle weakness and numbness when she sat for a long time or is in bed; that she had a "torn shoulder on the right[]"; and that she could not move sometimes. (Id. at 12). Three days later, plaintiff continued to complain about right sided pain and tingling in both arms and legs since her fall in 2008. (Id. at 9-10; see id. at 44 (plaintiff restricted to lifting less than fifteen pounds; no ladders/no upper bunk; no outdoor work; no prolonged standing)). Plaintiff had "[n]otable decrease in muscle strength in her right hand grip," and her range of motion was limited such that she was "[o]nly able to actively [move her right] shoulder to [ninety] degrees of flexion before being limited by pain." (Id. at 10).

### b. POST-INCARCERATION MEDICAL RECORDS

Following her release, plaintiff began treatment with Dr. Rebecca Berman, at a subsidiary of Massachusetts General Hospital on August 21, 2012. (See Dkt. #124-9, at 92-99). Plaintiff reported several ailments, including weakness in her right arm and leg upon waking "[i]n the last few months." (Id. at 93). Plaintiff explained that the pain resulted from a "syncopal episode while being arraigned in court" in 2008. (Id.).[19] Upon examination, Dr. Berman found plaintiff's right shoulder tender to touch, and painful upon extension, but

---

[19]At her deposition, plaintiff testified as to this fall in court, but this time allegedly from an asthma attack, and she had no injuries from this incident. (Pl. Depo. at 47).

"[s]trength and tone [were] otherwise normal everywhere." (Id. at 94). On the same day, plaintiff underwent an MRI of her brain in light of her headaches and body weakness; further evaluation with a "3D time-of-flight MRA or CTA of intracranial circulation [was] recommended." (Id. at 98). On October 23, 2012, Dr. Berman indicated that she would refer plaintiff to an orthopedic surgeon for her knee in which she had a meniscus tear, and physical therapy. (Id. at 90; see id. at 88). She also authored a note stating that plaintiff had a "lifting restriction with her right arm, [could not] sit or stand for extended periods of time, and [was] unable to walk due to her medical issues under our care." (Id. at 91). A month later, plaintiff was walking with a cane; Dr. Berman noted for the second time that she was referring plaintiff to an orthopedic surgeon. (Id. at 83-86).

When plaintiff returned to Dr. Berman on April 1, 2013, she noted that the "recent MRI of [plaintiff's] shoulder [was] unremarkable[,]" and she opined that plaintiff likely had myofascial pain in her shoulder and upper back, for which Dr. Berman referred plaintiff for trigger point injections. (Id. at 79-81).[20] Plaintiff was seen by Dr. Meijuan Zhao on April 29, 2013; she found 5/5 strength in her shoulder and noted plaintiff's pain. (Id. at 77-78). She diagnosed plaintiff with right shoulder chronic rotator cuff tendinopathy; reactive myofascial pain in the neck and upper back; and right foot pain. (Id.). When plaintiff returned to Dr. Berman on September 9, 2013,[21] Dr. Berman noted that plaintiff had been in Florida for the past several months. (Id. at 31-33). Dr. Berman authored a note that day that plaintiff "has limited range of motion of [her] shoulder and difficulty climbing stairs[, and is] cane

---

[20]Dr. Berman noted that plaintiff had been denied disability benefits. (Id. at 79).

[21]On May 7, 2013, Dr. Berman noted that plaintiff had missed her four previously scheduled appointments. (Id. at 34). Plaintiff missed appointments in 2014 as well. (See id. at 19, 21).

dependent[.]" (Id. at 30). On October 7, 2013, Dr. Berman authored a note stating that plaintiff's limited range of motion of her shoulder prevented her from lifting with her right arm; she had pain with sitting and standing for long periods of time; she was cane dependent and had difficulty climbing stairs. (Id. at 28; see also id. at 26-27). In an addendum, she added that plaintiff had a "physical therapy evaluation in June 2013 . . . where they noted decreased rotator cuff strength and numbness." (Id. at 25).

On November 6, and again on December 2, 2013, Dr. Zhao noted that the etiology of plaintiff's right arm and leg numbness was unclear. (Id. at 69, 74). Dr. Zhao authored a note on December 2, 2013 that plaintiff was receiving an injection for her right shoulder pain; she was in physical therapy twice a week; and she was ambulating with a cane. (Id. at 71). Plaintiff underwent an MRI of her cervical spine on November 12, 2013; there were "[m]ild degenerative changes at C6-7." (Id. at 82).

Plaintiff was seen by Dr. Berman on January 15, 2014, but Dr. Berman pointed out, as she had in other medical notes, that Dr. Zhao was treating plaintiff's shoulder pain. (Id. at 23-24; see id. at 31). In a note dated February 11, 2015, Dr. Berman opined that plaintiff "has been disabled with right sided weakness which limits her ability to sit/stand or do basic activities of daily living." (Id. at 12; see id. at 16).[22] Additionally, "[s]he walks with a cane and [has] been doing acupuncture monthly and physical therapy biweekly. She is on SSI for this disability." (Id.). On that same day, plaintiff reported to Dr. Berman that her right sided numbness was worse as she burned her hand earlier that week and did not feel it. (Id. at 13-14). Over a year later, on May 23, 2016, plaintiff returned to Dr. Berman; she was in a

_____

[22]Previously, in her medical note dated September 8, 2014, Dr. Berman stated that plaintiff "needs letter on disability for court stating that [she] has  R sided weakness, unable to lift with R arm and can only stand or sit for longer than 2 hours at a time. [N]eeds assist dressing, showering." (Dkt. #124-9, at 18).

motor vehicle accident and complained of pain in her head and right shoulder.  (Id. at 48-59).[23]

While there are some records that contradict plaintiff's assertion that her right shoulder pain resulted from Perkins pulling on her arm, and she concedes that none of her current doctors have related her present pain to the May 4, 2008 incident (Pl. Depo. at 29), the record is not full of contradictions, and in fact, most of the medical records are consistent.  Accordingly, despite defendant's argument to the contrary, this is not a case that fits within the rare Jeffreys exception such that the Court shall assume the role of assessing plaintiff's credibility. As discussed thoroughly above, the records document an injury on May 4, 2008.  The liability for that injury, if any, is not a question for the Court at this time, but is instead reserved for a bench trial.   Accordingly, summary judgment on plaintiff's negligence claim is denied.[24]

The volume of medical records documenting defendant's continuous medical treatment of plaintiff following the May 4, 2008 incident brings us to the second issue: whether plaintiff's medical malpractice claim under the FTCA for the care, or the lack thereof, that she received after the injury, can survive summary judgment.

---

[23]Plaintiff was also seen on January 1, 2016 and April 19, 2016, but the medical records do not reflect notes from those visits.  (Id. at 38-45).

[24]In its brief, defendant also argues that plaintiff cannot prevail on her claim that "she suffered significant monetary damages" because she can no longer work as a full-time nurse in the United States due to her "weakened condition."  (Dkt. #124, at 4-5).  Defendant is correct that, at her deposition, plaintiff testified that while she graduated from nursing school in Haiti and attended classes for two years at a nursing school in Massachusetts, she twice has failed to pass the NCLEX test in order to become a registered nurse in this country. (Pl. Depo. at 48-51).  Thus, at trial, plaintiff will be precluded from introducing evidence as to any potential lost earnings as a registered nurse.

## 2. MEDICAL MALPRACTICE CLAIM

"The rule of law that distinguishes between medical malpractice and ordinary negligence requires a determination of whether the injury alleged occurred during treatment because of a negligent act or omission that was substantially related to treatment." Trimel v. Lawrence & Memorial Hosp. Rehab. Ctr., 61 Conn. App. 353, 360 (Ct. App. 2001), certif. denied, 258 Conn. 711 (2001). In this case, plaintiff asserts in her Complaint that "[d]ue to the lack of due diligence and delay in access to proper medical treatment[,]" she "suffered . . . severe pain and numbness in her entire [right] side," (Dkt. #1, at 5), and she asserts in her brief in opposition that she is "permanently disable[d]" due, in part to "delayed . . . proper medical care and treatment[]" by the medical professionals with whom she had a medical professional-patient relationship. (Dkt. #127, at 1). Thus, her second claim is a medical malpractice claim brought under the FTCA.

As stated above, "'the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees.'" Freeman, 16 F. Supp. 3d at 219, quoting Liranzo, 690 F.3d at 86 (additional citation omitted). Under Connecticut law, prior to filing a claim for medical malpractice, a plaintiff must first conduct a "reasonable inquiry . . . to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." CONN. GEN. STAT. § 52-190a(a).[25] "The complaint . . . shall contain a certificate of the attorney or party filing the action . . . that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant . . . ." Id. "The failure to obtain and file the written opinion

---

[25]In its brief, defendant erroneously refers to "Connecticut General Statutes, 52-190(a)." (See Dkt. #124, at 9).

required by subsection (a) of this section shall be grounds for the dismissal of the action." CONN. GEN. STAT. § 52-190a(c).

In its brief in support, defendant repeats the argument, <u>verbatim</u>, from its brief from the 2014 summary judgment motion, namely: "[t]he negligence as alleged by plaintiff in this case functionally amounts to a claim of malpractice[;]" thus, "[i]n order to prosecute plaintiff's claims and the lingering effects from the treatment of the staff at FCI Danbury, plaintiff will need a competent medical expert to testify on her behalf[,]" and plaintiff "cannot offer any legally competent evidence to enable a reasonable trier of fact to return a verdict in her favor[]" as she has "no competent legal medical testimony[.]" (Dkt. #124, at 9-10 (citations omitted); Dkt. #66, Brief at 4-5 (citations omitted)).[26] As defendant is, no doubt, aware, this Court has already ruled on this exact argument as it related to, and continues to relate to, the requirements set forth in CONN. GEN. STAT. § 52-190a. As this Court held in its April 2014 Ruling,

> "Connecticut law requires that, before filing a medical malpractice claim, a reasonable inquiry must be conducted and a certificate of good faith accompanied by an opinion letter that medical negligence has occurred must be filed with the complaint." <u>Cole v. Greene</u>, No. 3:11 CV 543 (SRU), 2013 WL 1759571, at *1 (D. Conn. Apr. 13, 2013), <u>citing</u> CONN. GEN. STAT. § 52-190a. The purpose of section 52-190a is "to prevent frivolous medical malpractice actions." <u>Bennett v. New Milford Hosp., Inc.</u>, 300 Conn. 1, 18 (2011)(citation & internal quotations omitted).

---

[26]The cases defendant cites do not address the need for competent medical expert testimony under CONN. GEN. STAT. § 52-190a(a). (<u>See</u> Dkt. #124, at 9, <u>citing Calvert v. UConn Health Ctr.</u>, 142 Conn. App. 738, 740 (Ct. App. 2013)(complaint included written opinion as required by section 52-190a(a) but did not receive authorization to sue from the claims commissioner); <u>Miles v. Cty of Broome</u>, No. 04CV1147, 2006 WL 561247, at *3-4 (N.D.N.Y. Mar. 6, 2006)(Plaintiff "asserted claims of a medical malpractice and a violation of his Eighth Amendment rights. As such, it was reasonably certain that the case would involve medical testimony." But case dismissed for failure to comply with FED. R. CIV. P. 37(c)(1) by failing to disclose an expert witness.); <u>Trammell v. Keane</u>, 338 F.3d 155, 161 (2d Cir. 2003)(articulating summary judgment standard)).

. . . [C]onsistent with section 52-190a, defendant appropriately argues that plaintiff is required to "obtain a written opinion of an appropriate medical discipline in order to bring a malpractice action." (Dkt. #66, Brief at 4). . .

Defendant filed its answer on September 9, 2011 (Dkt. #7), which answer did not include any affirmative defenses . . ., nor did it "make mention of section 52-190a or otherwise dispute service of process or personal jurisdiction." [Cole,] 2013 WL 1759571, at *2. Thus, . . . to the extent defendant seeks summary judgment on grounds that plaintiff has failed to obtain a written opinion consistent with section 52-190a, this defense has been waived and summary judgment on that ground is denied. See id.

2014 WL 1366194, at *6-7 (footnote omitted).[27]

The foregoing notwithstanding, defendant now posits the identical argument in support of his contention that plaintiff's medical malpractice action must fail as she has not disclosed a medical expert. (Dkt. #124, at 9-10). Construing plaintiff's claim as liberally as possible, plaintiff is alleging that as a result of negligence by BOP medical professionals, both in a delay in care and in a failure to provide proper medical treatment, her condition has worsened and is now disabling. Specifically, she alleges in her complaint that following the May 4, 2008 incident, "[d]ue to the lack of due diligence and delay in access to proper medical treatment, [she] suffered and continues to suffer[,] . . . severe pain and numbness in her entire [right] side[.]" (Dkt. #1, at 5). Other than this conclusory allegation, however, plaintiff does not address what specifically caused her to become "permanently disable[d,]" nor does she point to any gaps, delay, or deficits in the treatment she received since May 4, 2008.

---

[27]This Court also held in the April 2014 Ruling that this conclusion regarding plaintiff's medical malpractice claim "does not bar defendant from filing an appropriate Motion in Limine with respect to plaintiff's claims for medical malpractice, as opposed to her claims for negligence, at trial." Id. at *8, n.7. This Court explained that the April 2014 Ruling "simply holds that plaintiff's non-compliance with section 52-190a is not grounds for denying her a trial when such non-compliance was not asserted as an affirmative defense by defendant, especially when there are negligence claims against non-medical staff in the lawsuit." Id.

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury[.]" Gold v. Greenwich Hosp. Assn., 262 Conn. 248, 254-55 (2002)(internal quotations & citation omitted). "Generally, the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for a proper medical diagnosis and treatment are not within the common knowledge of laypersons." Boone v. William W. Backus Hosp., 272 Conn. 551, 567 (2002)(internal quotations & citations omitted). However, there are three exceptions to the necessity of obtaining expert testimony to prove a plaintiff's case in a medical malpractice action: (1) when the "medical condition is obvious or common in everyday life[]"; (2) when the negligence is so "gross as to be clear even to a lay person"; and, (3) when the plaintiff's "evidence [of injury] creates a probability so strong that a lay jury can form a reasonable belief[.]" Id. (internal quotations & citations omitted).

As discussed at length above, after the May 4, 2008 incident, plaintiff was seen at Danbury Hospital's emergency room, followed by consistent treatment at FCI Danbury and, after she was transferred, at FCI Waseca. Plaintiff's medical records do not establish a delay in treatment. The first record of treatment following the May 4, 2008 incident is from the emergency room at Danbury Hospital where plaintiff was seen two days later. (Dkt. #124-5, at 93-95). Over the next seventeen months, plaintiff saw Dr. Sanders or other BOP medical professionals at FCI Danbury at least eight times; was referred for an MRI, which did not show an acute injury; and was referred for an orthopedic consult at FCI Danbury, and seen by an orthopedist on at least two occasions. (See Dkt. #124-4, at 1-6, 8-10; Dkt. #124-5, at 1-2, 8, 23-24, 27, 31, 88, 93-99, 101, 106, 109, 111). Additionally, after reviewing x-rays

taken two days after plaintiff's injury, plaintiff was informed that "surgery would <u>not</u> be indicated as there was no fracture or dislocation." (Dkt. #124-4, at 9)(emphasis added).

Plaintiff does not begin to complain of numbness in her right side until about a week after she was transferred to FCI Waseca in October 2009, over seventeen months after the underlying incident. (<u>See</u> Dkt. #124-6, at 71). Over the course of the two and a half years that plaintiff was incarcerated at FCI Waseca, she received regular care for her complaints of pain and numbness. (<u>See</u> Dkt. #124-6, at 9, 13-14, 17, 32-38, 40, 42, 55, 59-66, 71, 85, 159-61; Dkt. #124-7, at 26-29, 33-34, 54-55, 102-03, 113-16; Dkt. #124-8, at 9-10, 12, 18-20, 44). This regular care is well summarized in an Administrative Remedy Response, dated March 12, 2010, in which plaintiff's Request for Administrative Remedy of "treatment for shoulder pain[]" was denied for the foregoing reasons:

> With regards to your complaint of shoulder pain, your record indicates you suffered an injury in 2008, while at FCI Danbury. A complete evaluation was conducted to include an MRI. You were diagnosed with bursitis, which is a painful inflammation to the joint area. You have been evaluated on several occasions at FCI Waseca for this complaint. There were no new findings except a limited range of motion. You were provided with Sulindac for the inflammation and pain, and a referral for evaluation by the Physical Therapist was made. You saw the Physical Therapist on February 19, 2010. He noted a full range of motion and some parasthesia due to pain. He provided you with exercises to improve active range of motion and strength in the shoulder. You are encouraged to follow the recommended exercise plan. At this time, there are no recommendations for further evaluation by a Neurologist or Orthopedic Specialist. . . .

(Dkt. #124-6, at 163).[28]  There are no administrative complaints in the record from FCI Danbury, and this is the only Request for Administrative Remedy relating to the injury at

_____

[28]On January 1, 2011, defendant responded to plaintiff's Administrative Remedy, received on December 23, 2010, in which plaintiff claimed that the medical staff at FCI Waseca failed to conduct a full injury assessment following a fall on November 15, 2010, due to acute abdominal pain. (Dkt. #124-7, at 120-23). Defendant detailed the incident, as well five medical appointments in the following months, before concluding that plaintiff received an "appropriate assessment and treatment[,]" and her condition is deemed to be stable. (<u>Id.</u>).

issue in this case. Additionally, in the records of plaintiff's medical care following her release from custody, plaintiff reported pain and weakness in her right arm and leg, but both Dr. Berman and Dr. Zhao found plaintiff's strength and tone were normal (see Dkt. #124-9, at 77-78, 92-94)[29]; the results of an MRI of plaintiff's shoulder were "unremarkable[,]" (id. at 79-80); and the etiology of plaintiff's right arm and leg numbness was "unclear[.]" (Id. at 69, 74). Notably, plaintiff reported to Dr. Berman that the origin of her right-sided pain was a "syncopal episode while being arraigned in court" in 2008 (see id. at 93)[30]; at that point, even plaintiff did not connect her pain to the May 4, 2008 incident. As of December 2013, plaintiff was scheduled to receive a cortisone injection in her right shoulder under the care of Dr. Zhao; she received physical therapy twice a week; and she was ambulating with a cane. (Id. at 71). However, although there are additional records from Dr. Berman in which she repeated that Dr. Zhao was treating plaintiff's orthopedic issues, there are no additional records from Dr. Zhao.

This case draws substantial similarities to a case brought by an inmate under the FTCA in our sister court in the Eastern District of New York. Nabe v. U.S., No. 10 CV 3232 (NGG)(VPP), 2014 WL 4678249 (E.D.N.Y. Sept. 19, 2014). In that case, the plaintiff asserted a claim for medical malpractice arising out of treatment, or the lack thereof, for injuries allegedly inflicted during an altercation with his cellmate while he was incarcerated at the Metropolitan Detention Center ["MDC"]. Id. at *2. Plaintiff was punched in the face and the

---

[29]Despite her limited findings, Dr. Berman authored a note after her second appointment with plaintiff stating that plaintiff had a "lifting restriction with her right arm, cannot sit or stand for extended periods of time, and [was] unable to walk due to her medical issues under our care." (Id. at 91). She authored several similar notes over the next two years. (Id. at 28; see also id. at 16, 30).

[30]See also note 19 supra (plaintiff testified at her deposition that courtroom fall in 2008 was due to an asthma attack).

cell door was slammed on his feet during the underlying altercation; plaintiff was seen at the MDC for an injury to his upper lip, but claimed that he requested and was denied treatment for the injury to his feet which later became infected. Id. At a later altercation which arose because of the odor from plaintiff's then-infected feet, plaintiff was punched in the mouth, injuring his tooth, for which he received treatment but claimed that he, again, was denied treatment for his injured feet. Id. Eventually, when he was transferred to FCI Fort Dix, plaintiff received what he claimed were "ineffective[]" treatments for his infected feet. Id. at *3.

After reviewing plaintiff's medical records, U.S. District Judge Nicholas Garaufis found that plaintiff "did receive treatment, and [that the records did] not on their face establish proximate causation of his current ailments." Id. at *9. Additionally, he found that plaintiff received medical care immediately following both altercations that resulted in injuries to his mouth, that neither medical treatment record reflected injury to his feet, that plaintiff signed off on both medical forms attesting to the injuries warranting treatment at that time, and that plaintiff received "extensive care" for the skin infection on his feet when he was transferred to Fort Dix. Id. Thus, based on his review of the records, Judge Garaufis concluded that nothing contained in the records "attests to the cause" of the injury to plaintiff's feet, "let alone links them with either injuries sustained or poor care received during his time at the MDC." Id. The court held that plaintiff had provided "no expert testimony to satisfy" the standard for a medical malpractice claim under New York law, which standard is similar to Connecticut's malpractice standard.[31] Moreover, the court found that

---

[31]"To prevail on a medical malpractice claim under New York law, a plaintiff must demonstrate '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" Id. at *8, quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994).

the "record [was] devoid of evidence that the plaintiff's treatment fell below the normal level of care within the medical community, and thus [was] also devoid of any evidence that the supposedly negligent care he received proximately caused the injuries of which he presently complains." Id. Accordingly, Judge Garaufis held that plaintiff's "conclusory self-diagnoses" without any citations to evidence, and "plaintiff's own medical analysis, provided in his pro se briefs, [which] cannot be considered because he is not qualified as a medical expert[,]" "do not raise a triable issue of fact regarding medical malpractice under the FTCA[.]" Id. (multiple citations & internal quotations omitted); see also Davis v. U.S., 143 F. App'x 371 (2d Cir. 2005)(affirming district court's dismissal of case on summary judgment for plaintiff's lack of medical expert testimony regarding prison staff's treatment of inmate's respiratory illness).

This case does not meet one of the exceptions to the requirement that expert medical testimony is necessary in a medical malpractice case under Connecticut law. There is no evidence to suggest that the negligence alleged by plaintiff in this case was so gross so as to obviate a need for expert testimony, nor is plaintiff's medical condition so "obvious or common in everyday life[,]" as even her treating doctors have found that the "etiology . . . [of her pain and numbness is] unclear[.]" (Dkt. #124-9, at 69, 74); see Boone, 272 Conn. at 567 (citations and internal quotations omitted). Moreover, as plaintiff's voluminous medical records reflect, plaintiff's evidence of causation is lacking.

Plaintiff had the assistance of no less than six attorneys over the course of the past nearly seven years, with discovery extended multiple times, ultimately ending on June 23, 2017. (Dkts. ##112-13). As held above, there is no evidence in the record for plaintiff to establish a delay in treatment, and other than plaintiff's self-serving statements, plaintiff has

failed to point to evidence of proximate causation, nor has she disclosed a medical expert to testify in support of her medical malpractice claim.  In light of the record before the Court, plaintiff's medical malpractice claim under the FTCA cannot survive summary judgment.

Accordingly, defendant's Motion for Summary Judgment (Dkt. #122) is <u>granted in part and denied in part</u>.[32]

### III. CONCLUSION

For the reasons set forth below, defendant's Motion for Summary Judgment (Dkt. #122) is <u>granted in part and denied in part</u> such that summary judgment is <u>granted</u> with respect to plaintiff's claim that she suffered a heart attack, and summary judgment is <u>granted</u> on plaintiff's medical malpractice claim.   Summary judgment, however, is <u>denied</u> as to plaintiff's negligence claim under the FTCA regarding her right shoulder, right knee and right foot only, but is <u>granted</u> regarding her claims of right-side numbness from the May 4, 2008 incident.

Dated this 31st day of October, 2017, at New Haven, Connecticut.


/s/ Joan Glazer Margolis, USMJ_____
Joan Glazer Margolis
United States Magistrate Judge

_____

[32]Defense counsel and plaintiff shall contact Chambers to arrange a telephonic conference to discuss scheduling for a bench trial on the remaining negligence claim.