IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
:
CHARLOTINE DUVERGE        :        3:10 CV 1922 (JGM)
:
v.                         :
:
UNITED STATES OF AMERICA   :
:        DATE: FEBRUARY 23, 2018
---------------------------------------------------------x

MEMORANDUM OF DECISION

On December 7, 2010, plaintiff Charlotine Duverge, who was an inmate at Federal Correctional Institution in Danbury, Connecticut ["FCI Danbury"] [1] at the time the allegations in her complaint occurred, commenced this action pro se under the Federal Tort Claims Act ["FTCA"], 28 U.S.C. § 2671, alleging injuries arising out of treatment by her counselor following an asthma attack on May 4, 2008, and the medical treatment received thereafter. (Dkt. #1). Familiarity with the extensive litigation history of this case, and specifically with this Court's thirty-five page Ruling on Defendant's Motion for Summary Judgment, filed on October 31, 2017 (Dkt. #132), 2017 WL 4927658 ["October 2017 Ruling"] is presumed.[2]

---

[1] Plaintiff commenced this action pro se while she was incarcerated at the FCI Waseca, in Waseca, Minnesota. (Dkt. #1).

[2] As recited in the October 2017 Ruling, 2017 WL 4927658, at *1-3, U.S. District Judge Janet Bond Arterton stayed the case while plaintiff completed her sentence at FCI Waseca. (See Dkt. #15). On July 11, 2012, plaintiff was released from the custody of the Bureau of Prisons (see Dkt. #21), and on December 7, 2012, Judge Arterton restored the case to the active docket. (Dkt. #27). In December 2012, both of the parties expressed their intent to consent to the jurisdiction of this Magistrate Judge (see Dkts. ##28-29, 31), and on May 15, 2013, this case was transferred to this Magistrate Judge. (Dkt. #40).

Shortly before the case was restored to the active docket in 2012, two attorneys appeared on behalf of plaintiff (see Dkts. ##22-23), and then later withdrew their appearances. (See Dkts. ##32, 35, 39, 41-42). Plaintiff then had the benefit of no less than five Court-appointed pro bono attorneys who served in various capacities through the course of this protracted litigation (see Dkt. #51 (appointment of two attorneys for settlement purposes only); see also Dkts. ##52-53, 58-60; see Dkt. #70; see also Dkts. ##73, 76, 78-79, 95, 99; see Dkts. ##103-04 (appointed for discovery only); see also Dkts. ##118-19); Dkt. #139 (appointed for settlement purposes only),

Following this Court's October 2017 Ruling, 2017 WL 4927658, at *9-18, and the Ruling on Defendant's Motion in Limine and Order Regarding Plaintiff's Request for Issuance of Subpoenas (Dkt. #150), 2018 WL 619497, at *2, 3, 5, the issues remaining in this case are limited to plaintiff's claim of negligence under the FTCA arising out of the injury she claims she suffered to her right shoulder, right knee, and right foot. (See also Dkt. #144, at 3-4).

On February 12, 2018, a bench trial was held before this Magistrate Judge, at which plaintiff, Norman Reid, and Dr. Tiffany Sanders testified. (Dkt. #162-63).[3] For the reasons set forth below, judgment shall enter in favor of defendant in that plaintiff has failed to satisfy her claim for negligence under the FTCA.

## I. FACTUAL FINDINGS

The following constitutes this Court's findings of fact pursuant to FED. R. CIV. P. 52(a). On May 4, 2008, the date of the incident that is the subject of this lawsuit, plaintiff was incarcerated at FCI Danbury. Plaintiff testified that she was convicted of identity and bank fraud in 2005, and began her serving her sentence at the Danbury prison camp within FCI

---

including stand-by counsel at trial. (Dkt. #158).

The Court thanks Attorney Stephen Fogerty, plaintiff's pro bono stand-by counsel, for his professionalism and excellent work on behalf of plaintiff at trial.

[3]In accordance with the Pretrial Order, filed November 20, 2017 (Dkt. #135), ¶ 1(c)(i), three exhibits were admitted for identification purposes only: copy of plaintiff's full medical record from FCI Danbury (Joint Exh.1); copy of plaintiff's full medical record from FCI Waseca (Joint Exh. 2); and copy of plaintiff's post-release medical records (Joint Exh. 3).

In accordance with the same Pretrial Order, three exhibits were admitted in full: copy of pertinent FCI Danbury medical records (Joint Exh. 4); copy of pertinent FCI Waseca medical records (Joint Exh. 5); and copy of pertinent post-release medical records (Joint Exh. 6).

Neither party sought the admission of any additional exhibits. (See Dkt. #135, Pretrial Order, ¶ 1(c)(ii)). There had been Court Orders and Rulings regarding witnesses, but none of these issues arose at trial. (See Dkts. ##144, 150, 155).

Neither side wished to file any post-trial briefs.

Danbury on March 3, 2006. From March 3, 2006 until May 4, 2008, plaintiff did not have any medical problems other than asthma, diabetes and high blood pressure; she received medication for these conditions.

On May 4, 2008, plaintiff was informed by her counselor, Keisha Perkins, that she was to move from her basement unit to Room 5 which was located on the upper level of the split level facility. The upper and lower levels of the facility are separated by approximately ten to twelve stairs. Plaintiff, with the assistance of two other inmates, carried her personal items that she had purchased from the commissary, along with her mattress and uniform, from her basement unit to Room 5. After plaintiff arrived in Room 5, she learned that there was another inmate in her assigned lower bunk.[4] According to plaintiff, that inmate had just come from the hospital so she could not move from that bunk. Plaintiff left her items in Room 5 and went down the hall to Counselor Perkins' office to inform her of the "problem" with moving into Room 5. According to plaintiff, Counselor Perkins told her to go to Room 9 instead. Plaintiff returned to Room 5, gathered her items, and relocated to Room 9. When plaintiff arrived at Room 9 with all of her personal items, another inmate informed her that she could not use Room 9 because it was a "show room" used when the facility was "inspected" by "people from Washington." Plaintiff was told that she had "too much stuff" to be in that room. Accordingly, plaintiff returned to Counselor Perkins to report that this second room assignment did not work either. When plaintiff arrived at Counselor Perkins' office, she could not breathe because she had walked back and forth from several rooms. According to plaintiff, Counselor Perkins told plaintiff to leave her office because Counselor

___

[4]Plaintiff testified that she had a medical restriction to a lower bunk because of her asthma.

3

Perkins was not a "PA" and thus could not help plaintiff. Plaintiff testified that although she could not speak, she tried to tell Counselor Perkins that she could not breathe because Counselor Perkins kept "moving" her around the facility. Plaintiff left Counselor Perkins' office and walked about fifty to one hundred feet to the phone bank with the intention of calling her family. She was able to reach a telephone, but when she picked up the receiver, she was unable to dial the phone number because she was shaking and could not breathe. Another inmate came out of the kitchen, which was located nearby, and asked plaintiff what was wrong. At that moment, plaintiff "just passed out." She fell to the floor and the inmates nearby screamed, "Duverge is on the floor."

According to plaintiff, Counselor Perkins then came out of her office and approached plaintiff, who was laying flat on the floor. Plaintiff testified that Counselor Perkins then pulled on plaintiff's arm and shoulder to try to sit her up from a lying position. Plaintiff testified that she "can't say" that Counselor Perkins was trying to hurt her, but rather, Counselor Perkins was just trying to sit her up.

Plaintiff testified that she felt pain in her right arm but that she could not tell whether the pain was from Counselor Perkins pulling on her arm, or whether the pain was from her fall. Plaintiff also testified that she is not sure if her "shoulder was torn by [Counselor Perkins] pulling [on her arm] or [whether it was the caused] by the fall."

According to plaintiff, Counselor Perkins then said to her, "you're just mad because I moved you." Plaintiff could not respond because she could not breathe.

Norman Reid, who at the time of this incident was an Activity Lieutenant at FCI Danbury, testified that when he arrived at the telephone bank, there was an officer already there and plaintiff was laying on the floor saying that she needed to see medical. Lieutenant

4

Reid did not see Counselor Perkins "tug" on plaintiff's shoulder. According to Lt. Reid, if a BOP employee had "tugged" on the shoulder of an inmate, Lt. Reid would have reported such action as a use of force by a staff member towards an inmate; however, he did not make such a report.

According to plaintiff, PA Parella then arrived and assisted plaintiff to her feet. She went back to her basement unit. The next day, while she was at Bible Study, she was notified that her name was being announced. She was informed by FCI Danbury staff that she would be escorted to Danbury Hospital. At the hospital, x-rays were taken of plaintiff's right shoulder, which revealed "[n]o acute pathology." (Joint Exh. 4, Bates No. 462). Plaintiff testified that she was given pain medication and she returned to the Danbury camp after midnight.

Plaintiff was seen by Dr. Tiffany Sanders at FCI Danbury on May 29, 2008, at which time she had limited active and passive range of motion in her right shoulder, and complaints of pain with abduction past forty-five degrees. (Id., Bates No. 336-37). Dr. Sanders' medical notes reflect: "[plaintiff] states ER doc told her she would need surgery." (Id. at 336). Plaintiff, however, denies that she said that. After reviewing plaintiff's x-rays, Dr. Sanders "discussed with [plaintiff that] surgery would not be indicated as there was no fracture or dislocation." (Id.). Dr. Sanders questioned whether plaintiff had "some minor malingering," and she opined that it was "likely ok to [discharge] sling [sic] post orthopedic visit[.]" (Id. at 337).

On June 6, 2008, plaintiff reported continued pain in her right shoulder and right elbow. (Id. at 453, 466). Plaintiff was seen by Dr. Mullen, an orthopedist at FCI Danbury. (See id.). Dr. Mullen and Dr. Sanders noted that x-rays taken of plaintiff's right shoulder

5

were negative, and there was no swelling. (Id.).[5] Dr. Mullen also noted that plaintiff was "unable/unwilling to move [her] arm." (Id.). Three days later, on June 9, 2008, Dr. Sanders ordered an MRI of plaintiff's right shoulder. (Id. at 335). The MRI results revealed a "small amount of bursal surface signal toward the musculotendinous junction of the supraspinatus, consistent with fraying, minor partial thickness tearing." (Id. at 461). Additionally, the "acromion process [was] somewhat hooked in morphology but there [was] no subacromial enthesophyte or subacrominal subdeltoid bursitis[]"; the "biceps long head tendon [was] intact[]"; and there was "[n]o labral tear . . . detected." (Id.). The impression was "[b]ursal surface[] fraying or minor partial thickness tearing of the supraspinatus tendon[,]" and "[h]ooked acromion process[.]" (Id.).

Plaintiff continued to complain of pain during her next sixteen months at FCI Danbury.[6] On August 1, 2008, she received an orthopedic consultation by Dr. Mullen, who

---

[5]Additionally, as Dr. Sanders testified, x-rays taken on July 1, 2008 of plaintiff's chest, knees, right ankle, and right foot were normal and showed no acute process. (Id. at 472-76). There was "minimal marginal osteophyte formation and minimal patellar spurring[]" in her right knee, as well as "mild bony prominence at the base of the 5th metatarsal" on her right foot. (Id. at 474, 476).

[6]On September 12, 2008, BOP records reflect that plaintiff had complaints of right foot pain and right knee pain since May 2008; plaintiff rated her right foot pain as an eight on a scale to ten. (Joint Exh. 4, Bates No. 332). On October 21, 2008, it was noted that plaintiff was "doing well[]" and should follow up with medical personnel. (Id. at 396). On December 24, 2008, Dr. Sanders reviewed Dr. Mullen's orthopedic records and noted that plaintiff had "[m]ild right shoulder bursitis[,]" and "[r]ight peroneal tendinitis." (Id. at 392).

In March 2009, plaintiff complained of right foot, right knee, and right shoulder pain which had persisted since May 2008. (Id. at 388). She could not lift her right arm over her head; she had no tenderness with palpation, but she reported that the pain was ten on a scale of ten; and she had tenderness with palpation on her right foot and right knee, but no swelling in either location. (Id.). In August 2009, she continued to complain of right knee pain from her fall on May 4, 2008. (Id. at 366-67). At that time, although she rated her pain as a four on a scale to ten, she reported that her pain in both of her legs "[was] better because she has been taking [N]aproxen." (Id.).

Although plaintiff did not testify at trial regarding her right knee or right foot, this

noted that plaintiff's MRI did not show an acute injury, and that plaintiff was "getting better[.]" (Id. at 465). Dr. Mullen also noted that plaintiff had "good passive [range of motion]" and no swelling, and was diagnosed with right shoulder "impingement/bursitis[.]" (Id.). She was seen for another orthopedic consult in October 2008, at which time her range of motion was "better, although [she was] still giving poor effort." (Id. at 464).

On December 19, 2008, plaintiff was seen for another orthopedic consult with Dr. Mullen (Joint Exh. 4, Bates No. 463); the orthopedist found decreased range of motion in her right shoulder, but also questioned "poor effort"; plaintiff had mild swelling in her lateral foot; plaintiff was diagnosed with mild bursitis and right peroneal tendinitis. (Id.). On December 24, 2008, Dr. Sanders ordered over the counter NSAIDs and a right ankle brace for plaintiff. (Id. at 392). Dr. Sanders testified, however, that she could not recall if she prescribed an ankle brace for plaintiff. On March 27, 2009, Dr. Mullen administered a cortisone injection into plaintiff's right foot and prescribed NSAIDs for pain. (Id. at 452).

Plaintiff was transferred to FCI Waseca in early October 2009.[7] She continued to complain of pain in her right shoulder, knee and foot.[8] On December 31, 2009, plaintiff

---

Memorandum of Decision will nonetheless discuss these two body parts, in that there are medical records relating to them in Exhs. 4-6.

[7]Plaintiff testified that she thought she was transferred in October 2010.

[8]Plaintiff was seen for medical treatment twice on December 2, 2009; she complained of "[s]evere" right shoulder, knee, and foot pain and numbness. (Joint Exh. 5, Bates Nos. 540, 543). She returned the next day with complaints of muscle and joint pain. (Id at 533).

On February 1, 2010, plaintiff was seen, inter alia, for complaints of "severe" pain in her right shoulder, knee and foot. (Id. at 520). She was given Sulindac and informed that after the month's prescription runs out, she must use over-the-counter medications for pain management. (Id.). On February 19, 2010, plaintiff was shown physical therapy exercises for her hand and right shoulder pain. (Id. at 639; see id. at 518). On February 23, 2010, plaintiff was seen by Dr. Donald Collins at FCI Waseca who noted full range of motion in the right shoulder, and he recommended an evaluation to follow. (Id. at 637). The report notes a diagnosis in December 2008 of "mild right shoulder bursitis." (Id.).

underwent an x-ray of her right foot, the results of which were "[n]egative[.]" (Joint Exh. 5, Bates No. 651). As Dr. Sanders testified, on June 28, 2011, plaintiff again underwent radiology imaging of her right shoulder, the results of which were negative. (Id. at 767). On November 17, 2011, plaintiff received two injections in her right shoulder for pain. (Id. at 811). For the remainder of her time at Waseca, plaintiff continued to complain of muscle weakness, numbness and pain due to her "torn shoulder[.]" (See id. at 804).[9]

---

On March 11, 2010, plaintiff complained of pain and numbness; she understood that the results of the right foot x-ray were negative. (Joint Exh. 5, Bates No. 513-14). Plaintiff was seen for a neuropathy consult on March 15, 2010 with Dr. Collins. (Id. at 510). At this appointment, her story changed slightly, both in timing, and the sequence of events surrounding the fall. Plaintiff reported that she fell "last October as a result of an asthma attack[]"; she was not able to lift her right arm, and she was having episodes when her arm would become numb. (Id.). The examining doctor noted that plaintiff's "description of the fall in October [did] not seem logical[]" as she denied having had a seizure, yet stated that "an inmate who observed the October fall stated that there was some jerking of the extremities suggestive of a seizure." (Id.).

Three months later, on June 15, 2010, plaintiff reported numbness in her arm that lasted, at times, as long as thirty minutes. (Id. at 495). Plaintiff had "equal full range of motion bilaterally on arm/hands." (Id.). Plaintiff returned for a follow-up with neurology on July 16, 2010; she could not raise her right arm above eighty degrees or rotate it back more than twenty degrees. (Id. at 491-92). On August 2, 2010, plaintiff reported "[s]evere pain in [her] right shoulder and constant numbness[,]" adding, "[n]ow the numbness i[s] in my legs." (Id. at 487-88). Upon examination she had tenderness, decreased range of active and passive motion, weak hand grasp in her right hand, and limited abduction and flexion. (Id. at 487). The medical record noted a "[h]istory of torn rotator cuff and fractured shoulder on right." (Id. at 488).

On January 21, 2011, plaintiff complained of vision changes and "severe pain in [her] head and neck," which "began in November, after she fell." (Id. at 698). On March 21, 2011, plaintiff requested that she be seen by a physical therapist again because she had continued pain and numbness in her shoulder. (Id. at 691-94; see also id. at 687). She underwent physical therapy on June 3, 2011, in which medical note the therapist commented that plaintiff had "inconsistent effort" when she underwent physical therapy a year prior, and that x-rays were recommended but no further physical therapy follow up was recommended. (Id. at 768; see id. at 672).

[9]On October 22, 2010, plaintiff was seen by Neurology for an evaluation of her right arm and leg numbness and tingling; a brain MRI was recommended. (Joint Exh. 5, Bates Nos. 779-81; see id. at 719). On February 24, 2012, plaintiff reported that she was experiencing muscle weakness and numbness when she sat for a long time or is in bed; that she had a "torn shoulder on the right[]"; and that she could not move sometimes. (Id. at 804). Three days later, on February 27, 2012, plaintiff had "[n]otable decrease in muscle strength in [her right] hand grip," and her range of motion was limited such that she was "[o]nly able to actively [move her right] shoulder to [ninety] degrees of flexion before being limited by pain." (Id. at 802). She also

8

Plaintiff's pain did not subside following her release from FCI Waseca in 2012.[10] Following her release, plaintiff was treated by Dr. Rebecca Berman at a subsidiary of Massachusetts General Hospital (see Joint Exh. 6, Bates No. 184-87).[11] In a medical note dated November 27, 2012, Dr. Berman recited that plaintiff's pain resulted from a fall in 2008 when plaintiff

> had a syncopal episode while being arraigned in court. She had a brief [loss of consciousness]. . . . She went to the [emergency room], where no imaging was obtained. She had fallen on her right shoulder and right knee. Subsequent MRI of the knee showed small tear of the mensics and evidence that the kneecap was inflamed. . . .
>
> . . .
>
> Subsequent MRI of the shoulder showed a supraspinatus tear. . . .

(Id. at 185).[12] Similarly, in a medical note, dated April 1, 2013, Dr. Meijuan Zhao recited the

---

complained of right sided pain and tingling in both arms and legs since her fall in 2008. (Id. at 801).

[10] See notes 12-13 infra.

[11] On October 23, 2012, plaintiff was walking with a cane when needed, and Dr. Berman noted that she was referring plaintiff to an orthopedic surgeon. (Id. at 185, 189).

[12] On the same day, Dr. Berman authored a note stating that plaintiff had a "lifting restriction with her right arm, [could not] sit or stand for extended periods of time, and [was] unable to walk due to her medical issues under our care." (Id., Bates No. 192).

On August 21, 2012, Dr. Berman noted plaintiff's continued complaints of headaches and right-sided weakness when walking. (Id. at 195-96; see id. at 193-94). Dr. Berman noted that plaintiff should have an MRI of her brain, and that she is "referred to shoulder surgery[.]" (Id. at 198).

On September 9, 2013, Dr. Berman authored a note that day that plaintiff "has limited range of motion of [her] shoulder and difficulty climbing stairs[, and is] cane dependent[.]" (Id. at 105). On October 7, 2013, Dr. Berman authored a note stating that plaintiff's limited range of motion of her shoulder prevented her from lifting with her right arm; she had pain with sitting and standing for long periods of time; she was cane dependent and had difficulty climbing stairs. (Id. at 103). At her appointment on November 6, 2013, Dr. Berman noted that plaintiff "lives in Florida for several months[.]" (Id. at 149).

Plaintiff underwent an MRI of her cervical spine on November 12, 2013, the results of

9

May 4, 2008 incident as plaintiff had described it to her. (Id. at 154). Specifically, Dr. Zhao noted that plaintiff had an "asthma attack. She was not able to breathe and fell on the floor, she was not sure which side she landed on, but she started to experience pain on the right shoulder. . . [and] right knee[,] and report[ed] . . . having pain on the right lateral foot." (Id.; see id. at 154-56). There is no mention of any action by BOP personnel that led to the pain that plaintiff experiences. Dr. Zhao also noted that plaintiff was seen by Dr. Zarins in September 2012 and by Dr. Warner in March 2013, "and a repeat MRI, . . . has no tear and [is] unremarkable on the shoulder." (Id. at 154). Dr. Zhao also noted that "[t]he recent MRI of the shoulder is unremarkable and most likely [plaintiff] has some myofascial-type pain in the shoulder and upper back." (Id. at 156). She repeated that she "[r]eviewed [plaintiff's] recent MRI, which really has no major tear or capsulitis." (Id.).[13]

## II. CONCLUSIONS OF LAW

The following constitutes this Court's conclusions of law pursuant to FED. R. CIV. P.

---

which revealed "[m]ild degenerative changes at C6-7. No substantial central canal or foraminal stenosis." (Id. at 157).

Plaintiff was seen by Dr. Berman on January 15, 2014, but Dr. Berman pointed out, as she had in other medical notes, that Dr. Zhao was treating plaintiff's shoulder pain. (Id. at 98). On September 8, 2014, Dr. Berman noted that plaintiff had right sided weakness, is unable to lift with her right arm, and can only stand or alternate sitting and standing for less than two hours at a time. (Id. at 92; see id. at 91). Over a year later, on May 23, 2016, plaintiff returned to Dr. Berman; she was in a motor vehicle accident and complained of pain in her head and right shoulder. (Id. at 123).

[13]Plaintiff was seen by Dr. Zhao on April 29, 2013; she found 5/5 strength in her shoulder and noted plaintiff's pain. (Id. at 152). She gave plaintiff a lidocaine injection in her right shoulder. (Id. at 153).

On November 6, and again on December 2, 2013, Dr. Zhao noted that plaintiff has right shoulder rotator cuff tendinopathy/capsulitis, and that the etiology of plaintiff's right arm and leg numbness was unclear. (Id. at 144-45, 149). Dr. Zhao authored a note on December 2, 2013 that plaintiff was receiving an injection for her right shoulder pain; she was in physical therapy twice a week; and she was ambulating with a cane. (Id. at 146).

52(a)(1). Plaintiff has brought her action against the Government under the FTCA. The FTCA is a limited waiver of the United States' sovereign immunity. See 28 U.S.C. § 2679(b)(1). The FTCA permits individuals to file, inter alia, personal injury claims against the United States based on the acts of a government employee who is acting within the scope of his or her employment, if "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "'[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees.'" Freeman v. United States, 166 F. Supp. 3d 215, 219 (D. Conn. 2016), quoting Liranzo v. United States, 690 F.3d 78, 86 (2d Cir. 2012)(additional citation omitted). Thus, because the incident occurred in Connecticut, Connecticut law applies. See 28 U.S.C. § 1346(b)(1).

The elements of a negligence cause of action under Connecticut law are duty, breach of that duty, causation and actual injury. Jagger v. Mohawk Mountain Ski Area, Inc., 269 Conn. 672, 687 n.13, 849 A.2d 813 (2004)(citations & internal quotations omitted)("essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury[]"). Although "[f]ew courts have expounded on what duty of care is owed to an inmate[,]" Dominguez v. United States, 963 F. Supp. 2d 107, 115 (D. Conn. Aug. 9, 2013), the few who "have considered the issue have treated inmates as invitees and thus subject to the highest duty of care." Id., citing Dubuis v. United States, No. 3:06 CV 1443 (DJS), 2008 WL 410429, at *4 (D. Conn. Feb. 12, 2008)(additional citation omitted); see also Crews v. United States, No. 3:06 CV 1765 (JGM), 2008 WL 11376617, at *5 (D. Conn. Sept. 23, 2008), approved & adopted absent objection, No. 3:06 CV 1765 (JBA), 2008 WL 11377678 (D. Conn. Oct. 29, 2008). In this case, plaintiff has failed to

establish that defendant, through Counselor Perkins, breached its duty of care nor has plaintiff established that defendant, rather than the fall itself, was the cause of her injury.

As stated above, plaintiff testified that Counselor Perkins tried to assist plaintiff after her fall by trying to sit her up from a supine position. In plaintiff's own words, Counselor Perkins was not trying to hurt her, but rather, she was trying to sit her up. There is no evidence that defendant breached its highest duty of care to protect plaintiff, and plaintiff's own testimony belies such a conclusion. Additionally,

> [t]o prevail on a negligence claim, a plaintiff must establish that the defendant's conduct legally caused [plaintiff's] injuries. . . . We focus our inquiry, therefore, on the connection, if any, between the defendant's conduct and the plaintiff's injuries. In order for the defendant to be held legally responsible for the plaintiff's injuries there must have been a causal connection between the plaintiff's injuries and the conduct of an employee, agent or servant of the defendant.

Paige v. St. Andrew's Roman Catholic Church Corp., 250 Conn. 14, 24 & 26, 734 A.2d 85 (1999)(internal quotations & citation omitted). Plaintiff testified that she did not know if the pain she felt immediately following her fall was from Counselor Perkins tugging on her arm to sit her up, or if the pain was from the fall itself.

Moreover, while plaintiff's medical records contain recitations of the incident that caused her continuous right sided pain, not one of the recitations links the actions of Counselor Perkins to plaintiff's injury. Rather, as discussed above, plaintiff relayed that she fell in 2008, from which she has continuously experienced pain in her right shoulder, right knee and right foot. (See Joint Exh. 6, at 154, 185). Specifically, plaintiff relayed to Dr. Berman that she has a history of knee and shoulder pain that are linked to an incident in 2008. (Id. at 185). Not only is there no mention of Counselor Perkins, or anyone else, pulling on plaintiff's arm, the incident plaintiff described to Dr. Berman reportedly occurred in court,

and not at a BOP facility. (Id.). According to plaintiff, her right-sided pain began in 2008 after she had fallen on her right shoulder and right knee as a result of a syncopal episode, and brief loss of consciousness, which, according to plaintiff, occurred while she was being arraigned in court. (Id.). Additionally, the description of her fall in 2008 differs as it was told to Dr. Zhao, but plaintiff's description still does not link Counselor Perkins as the cause of her injuries. Plaintiff told Dr. Zhao that her pain began in 2008 following a fall after experiencing an asthma attack and "she [plaintiff] was not sure which side she landed on, but she started to experience pain on the right shoulder. . .[and] right knee[,] and report[ed] . . . having pain on the right lateral foot." (Id. at 154). There is no reference to a pulling or tugging on plaintiff's arm that plaintiff claims led to her shoulder injury, nor is there reference to the involvement of any BOP employee.

Thus, in light of the testimony and evidence before the Court, plaintiff is unable to satisfy a claim for negligence under the FTCA, and judgment shall enter in favor of defendant.

## II. CONCLUSION

Accordingly, for the reasons stated above, judgment shall enter in favor of defendant and the Clerk is directed to close this case.

Dated this 23rd day of February, 2018, at New Haven, Connecticut.

                        _/s/Joan G. Margolis, USMJ_____
                        Joan Glazer Margolis
                        United States Magistrate Judge